Filed 12/12/24  In re J.M. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | B337319 (Los Angeles County Super. Ct. No. 24CCJP00365A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>A.O.,<br><br>        Defendant and Appellant. |  |

APPEAL from an order of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore, and Cristina Gutierrez Legaspi, Judge.  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————————————————

In this juvenile dependency appeal, A.O. (mother) challenges the juvenile court's jurisdictional finding and disposition order continuing dependency jurisdiction over her young son, J.M. (son). We conclude both substantial evidence supports the court's jurisdictional finding and the juvenile court did not abuse its discretion in continuing its jurisdiction at the disposition hearing. Thus, we affirm.

## BACKGROUND

### 1. The Family and Events Preceding the Petition

Son's father (father) and mother were married in 2019. In 2021, after son was born, they separated and, when the underlying proceedings began, were in the process of divorcing. Mother and father do not have an amicable relationship. In 2021 or 2022, mother obtained a criminal restraining order protecting her from father due to domestic violence incidents. Mother was son's primary caregiver. Mother believed father abused drugs and alcohol. Mother said she did not use drugs and did not have mental health issues.

Because of the restraining order against him, father had not been in contact with mother or son for years. Father did not know if mother had mental health issues, but noted sometimes mother "is happy and then she 'loses her shit.'" Father stated

2

that at times when they were together, mother was " 'delusional and convinced that I was cheating on her.' " Father explained mother got angry and " 'would not listen to reason' " and could " 'not let it go.' " Father stated, although he was not innocent, the domestic violence between him and mother included mother scratching and hitting him. Father said mother randomly would scratch him and he did not know why. Father's mother (paternal grandmother) similarly reported mother " 'was always accusing [father] of having sex with all these women' " and " 'was very suspicious of things.' " Paternal grandmother said mother " 'could flip on a dime. Her mood just flips for no reason. She'll [b]e fine one minute and then boom. She's walking out the door.' " Paternal grandmother noted, "The way [mother] can flip like that does worry me" and "I think something is off."

In 2019, mother's teenaged nephew, Marvin M. (Marvin), and niece, Ana M. (Ana), moved in with mother. They lived with mother for a few years until their father (maternal uncle) arrived in the United States in late 2021, at which time they moved in with their father. While Marvin and Ana lived with mother, she cared for and treated them like her own children. Although Marvin and Ana eventually lived with their father, who assumed all parental roles, mother remained their legal guardian for immigration purposes.

Son was born while Marvin and Ana were living with mother. From time to time, Marvin babysat son. On a few occasions after Marvin babysat son, mother noticed an abnormal rash on son's buttocks. Mother suspected Marvin sexually abused son. Mother told Marvin of her suspicions, but Marvin denied her allegations. Once, mother secretly recorded Marvin while he babysat son, but mother saw nothing suspicious.

3

Despite her suspicions of sexual abuse, mother neither called the police nor took son to be examined by a doctor.

In October 2023, at mother's request, Marvin agreed to babysit son. Mother picked up Marvin and brought him to her house. Once there, it was apparent mother did not need Marvin to babysit as son was not present. Instead, mother told Marvin she wanted to make a TikTok video and zip-tied him to a chair. Mother then interrogated Marvin, accused him of sexually abusing son, and would not free him from the chair. Eventually, Marvin told mother he had been videotaping her with his phone, and mother let him go or Marvin was able to break free. Marvin went outside and called law enforcement. The zip ties had made red marks on his wrists and ankles. Mother was arrested but no charges were brought because mother was a "first-time offender."

Marvin denied sexually abusing son. He was shocked at what mother had done to him. Mother had never done anything like that before. Both Marvin and Ana reported mother had always been "kind and loving." They had never seen mother act inappropriately toward son or abuse alcohol or drugs. Others, including maternal uncle and a maternal aunt, echoed similar sentiments about mother. However, maternal uncle stated mother "has a difficult personality and has always been loud and difficult to deal with." Father said he never saw mother mistreat son, Marvin, or Ana. No one expressed concern about mother's ability to parent son. Nonetheless, Marvin and Ana no longer wanted contact with mother.

In November 2023, son underwent a forensic medical exam. Mother reported she had never seen blood in son's pants or diapers. Son denied having any pain in his buttocks. The forensic report stated son's exam "was a Normal exam," which

4

could "neither confirm nor negate sexual abuse." Father did not know whether son had been sexually abused, but he tended to believe the social workers and doctors who said son had not been sexually abused over what mother believed. Father stated mother "was extremely overprotective with" son and was "very impulsive."

Although eventually mother recognized her treatment of Marvin was wrong, she continued to believe son had been sexually abused. Mother felt no one cared about her concerns. Nonetheless, mother was remorseful and willing to accept and comply with recommended services.

## 2. Petition

In February 2024, the Los Angeles County Department of Children and Family Services (Department) filed a Welfare and Institutions Code section 300 petition on behalf of son (petition).[1] The petition alleged two identical counts, one brought under subdivision (a), the other brought under subdivision (b)(1). The two counts alleged son was at risk because mother physically abused Marvin, for which mother was arrested. Father was not named in the petition.[2]

At the initial hearing on the petition, the juvenile court detained son from father and released son to mother under Department supervision. The court ordered the Department to

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The Department first filed a section 300 petition on behalf of son in December 2023. However, that case was assigned an incorrect case number and, therefore, the Department asked that it be dismissed, allowing the Department to file the petition at issue here.

5

assist mother with family maintenance services and to make both announced and unannounced visits to confirm son's well-being and mother's compliance with court orders. Father was granted unmonitored day visits with son.

Prior to adjudication, a Department social worker spoke further with mother. She reiterated that she was remorseful for what she had done to Marvin, stating " 'that was the biggest mistake of my life.' " However, mother described what had happened with Marvin a little differently. She said she never tied Marvin to a chair, but instead she zip-tied his wrists and ankles while he was standing. She said Marvin rubbed his wrists against a wall and believed that was how he injured his wrists. She reported she used scissors to cut the zip ties when Marvin was at the wall and she realized he wanted to get out of them. She denied holding him hostage. The social worker observed son to be bonded with mother and well-behaved.

### 3. Adjudication and Disposition

The adjudication hearing was held on March 11, 2024. Counsel for the Department and son both noted that, for the most part, the facts were undisputed. Counsel for the Department emphasized that, at the time mother tied up Marvin, she was his legal guardian and, following that incident, had not shown much, if any, concern for Marvin. Counsel for the Department and son both argued the court should sustain the petition. On the other hand, counsel for mother urged the court to dismiss the petition. Although mother's attorney agreed mother was wrong to restrain Marvin, she did not believe mother's actions put son at any risk of harm. Mother's counsel noted not only was mother remorseful for her actions toward Marvin, but her abusive conduct toward

6

Marvin was an isolated incident.  All reports were that mother was caring, nurturing, and overprotective of son.

After hearing argument, the juvenile court dismissed the subdivision (a) count and sustained the subdivision (b)(1) count. The court noted mother had planned her abusive actions toward Marvin, "[T]his didn't just happen.  It happened over a period of time."  The court declared son a dependent of the court under subdivision (b) of section 300 and ordered him to remain released to mother under Department supervision.  The court granted father monitored visits with son, but a few days later changed father's visits to unmonitored.

In an April 2024 report for the court, the Department noted mother had completed anger management, parenting education, and co-parenting/divorce classes.[3]  However, mother believed individual counseling was unnecessary and had not participated in any.  The Department also reported mother did not agree with son having overnight visits with father, which son had done twice without incident.  A Department social worker stated she had "no child safety concerns at this time and that her only concern is the parents being unable to get along and co-parent."

The disposition hearing was held on May 1, 2024.  Counsel for the Department noted although father was nonoffending, he had been a noncustodial parent and did not have a history with son.  Therefore, the Department requested that son be placed with mother.  Counsel for the Department also urged the court to order further anger management classes for mother, as well as individual counseling.  Counsel for son was amenable to the court

---

[3] Later, at the disposition hearing, counsel for the Department stated the parenting and anger management courses mother completed were not Department-approved courses.

7

placing son with both parents so long as the Department could assist mother and father in developing "a custody arrangement that goes to a step up basis" given father's lack of history with son. Counsel for mother asked the court to terminate its jurisdiction with a custody order granting mother "full physical and full legal custody." Counsel noted mother had kept son safe and already had completed several courses. In the alternative, counsel requested placement with mother. Mother's attorney argued mother had completed sufficient courses prior to disposition and, other than further parenting classes, additional services were unnecessary. Counsel for father asked the court to place son with both parents.

After hearing argument, the juvenile court declared son a dependent of the court. Over the Department's and mother's objections, and noting father was nonoffending, the court ordered son released to both mother and father under Department supervision. Mother and father were ordered to develop a shared custody agreement and to participate in family maintenance services. The court ordered mother to enroll in individual counseling as well as anger management and "high conflict" parenting classes.

Mother appealed.

## DISCUSSION

### 1. Jurisdiction

#### a. Applicable Law

In this case, the juvenile court exercised its jurisdiction under subdivision (b) of section 300. Under that subdivision, a juvenile court may assert dependency jurisdiction over a child when, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm

or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.*, *supra*, at p. 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

### b.    Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are

9

sufficient facts to support the findings [and disposition order] of the trial court." ' " (*Ibid.*)  In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order.  (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  Substantial evidence " 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

### c. Substantial evidence supports the juvenile court's jurisdictional finding.

Mother argues substantial evidence does not support the juvenile court's finding that son was at substantial risk of serious physical harm due to mother's actions against Marvin.  We disagree.

Although mother was described as a doting parent both to son as well as to Marvin and Ana, she also was described as, at times, " 'delusional' " and able to " 'flip on a dime.' "  Moreover, mother's recent conduct toward Marvin was unquestionably abusive, irrational, and bizarre.  Although on appeal mother argues that, in luring Marvin to her home, tying him up, and berating him about sexually abusing son, she was "attempting to protect" son; we do not see it that way.  While mother adamantly believed son was being sexually abused, she took no protective measures, such as alerting law enforcement or taking son to be examined and cared for by a doctor or other professional.  Rather, mother continued to leave son with the very person she believed

10

was abusing him. Ultimately, mother was arrested for attempting forcefully to extract a confession from the alleged abuser. Regardless of mother's intentions, these are not the actions of a rational or protective parent.

We also do not agree with mother's assessment that her abusive conduct toward Marvin was simply a lapse of judgment for which she was remorseful. Although mother appeared to regret her actions and expressed remorse, her conduct was not a "mere lapse in judgment." Not only had mother preplanned her physically abusive questioning of Marvin, but her actions toward Marvin were the culmination of her obsessive belief that for some time Marvin had been sexually abusing son. Her conduct also lent support to the descriptions of mother as very suspicious and at times unable to listen to reason.

In effect, mother asks us to reweigh the evidence, which we cannot do. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) We conclude substantial evidence supports the juvenile court's jurisdictional finding.

Mother relies on *In re G.Z.* (2022) 85 Cal.App.5th 857. In that case, the minor child had subdural hematomas, the existence of which the mother could not explain. (*Id.* at pp. 869, 877.) Doctors were unsure of the cause of the internal bleeding, but opined the child had congenital conditions that may have caused the bleeding. (*Id.* at pp. 871–873, 877–878.) There was no evidence the hematomas were caused by abuse or neglect by anyone, let alone the mother. (*Id.* at p. 877.) On appeal, the court reversed the juvenile court's jurisdictional finding against the mother, concluding there was no evidence, let alone substantial evidence, that the child was at risk of harm as a result of neglect, abuse, or nonaccidental trauma. (*Id.* at p. 883.)

11

We find *In re G.Z.*, *supra*, 85 Cal.App.5th 857, factually distinct and, therefore, unpersuasive. In contrast to that case, here, mother took definitive steps to harm Marvin, took no rational steps to protect son from what she believed was real sexual abuse, and people who knew mother said she could be delusional at times and something about her seemed "off."

**2. Continuation of Dependency Jurisdiction**

**a. Applicable Law and Standard of Review**

Once a child is declared a dependent of the court under section 300, the juvenile court has wide discretion to make "any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) Although at the conclusion of the disposition hearing, the juvenile court can terminate jurisdiction, that is not the norm. (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 211.) Rather, "it will be an unusual case when protections imposed at disposition will be sufficient to permit the conclusion that termination is appropriate. It will be rarer still for a juvenile court to reach that conclusion when the parent with whom the child remains has been found to be an offending parent." (*Ibid.*) "Jurisdiction should not be terminated unless the court concludes services and ongoing supervision are not necessary to protect the child." (*Ibid.*)

We review the court's dispositional order for abuse of discretion. (*In re L.W.* (2019) 32 Cal.App.5th 840, 851.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

12

**b.     The juvenile court did not abuse its discretion.**

Mother argues the juvenile court abused its discretion when, at the disposition hearing, it continued its jurisdiction and supervision.  Again, we disagree.

The facts that support jurisdiction similarly support the juvenile court's decision to continue its jurisdiction over son.  Additionally, although as mother points out, by the time of the disposition hearing she had completed several courses, those courses were not Department-approved.  Thus, while mother's efforts certainly were commendable, unfortunately neither the Department nor the court could determine the value of the courses she took.  Moreover, mother never enrolled in individual counseling and indeed believed that was unnecessary.  On appeal, mother makes much of the fact the juvenile court never removed son from mother.  Although true, the logical conclusion is not that son required no court supervision.  Rather, the court kept son with mother because of court supervision.  Thus, although mother appeared to be on the right track and was making progress, it was reasonable for the court to continue its jurisdiction at the disposition hearing.  We find no abuse of discretion.

## DISPOSITION

The juvenile court's jurisdictional finding and dispositional order are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

RICHARDSON, J.